**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN W. MACIEJCZAK** | : | |
| **Plaintiff** | : | |
| | : | |
| **VS.** | : | **3:CV-02-1041** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **THE PROCTER & GAMBLE COMPANY,** | : | |
| **PROCTER & GAMBLE DISABILITY** | : | |
| **BENEFIT PLANS TRUST, THE PROCTER** | : | |
| **& GAMBLE DISABILITY BENEFIT PLAN** | : | |
| **CORPORATE REVIEWING BOARD, and** | : | |
| **THE PROCTER & GAMBLE PAPER** | : | |
| **PRODUCTS COMPANY** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Plaintiff John Maciejczak initiated this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq., to challenge the termination of his long-term disability benefits in 2001 by the Proctor & Gamble Company (collectively with the other Defendants, "P&G").  The parties have consented to have the Court decide the merits of the case on the submitted record.

Because P&G's Long-Term Disability Allowance ("LTDA") Plan accords discretion to P&G to determine eligibility for benefits, this Court reviews P&G's decision to terminate Mr. Maciejczak's benefits under an arbitrary and capricious standard of review.  A slightly heightened standard of review is warranted in this case, however, because P&G both

administered and funded the plan.  Even under this slightly heightened standard of review,

though, P&G's decision to terminate Mr. Maciejczak's long-term disability benefits was not

arbitrary and capricious.  Consequently, judgment will be entered in favor of P&G.

## I.  PROCEDURAL HISTORY

On June 14, 2002, P&G removed this case from state court, asserting that this Court

has jurisdiction over the case on both federal question and diversity of citizenship bases.  (Dkt.

Entry 1.)  The Plaintiff alleged violations of state law and ERISA in his complaint.  (Id.)

On September 30, 2002, P&G moved to dismiss the state law claims.  (Dkt. Entry 10.)

By Memorandum and Order dated March 17, 2003, this Court dismissed the state law claims

for bad faith, asserted under 42 Pa. C. S. § 8371, as preempted by ERISA.  (Dkt. Entry 20.)

On July 31, 2003, P&G moved for summary judgment on Plaintiff's remaining ERISA

claim.  (Dkt. Entry 23.)  The parties agreed that review of P&G's decision to terminate Mr.

Maciejczak's benefits should be under an arbitrary and capricious standard.  This Court,

however, determined that heightened scrutiny of P&G's decision was appropriate because the

Plan Trustees were potentially burdened by a conflict of interest in making disability

determinations.  Maciejczak v. Proctor & Gamble Co., No. CV-02-1041 (M.D. Pa. July 7, 2004)

(Dkt. Entry 32).  Specifically, this Court was concerned by evidence indicating that P&G directly

paid the benefits awarded under the plan while also selecting the Trustees who made benefit

determinations.  Id. at 16-17.  This Court was also concerned by possible procedural anomalies

in the manner in which P&G handled Mr. Maciejczak's claim.  Id. at 19-21.  Summary judgment

for P&G was deemed inappropriate under this heightened scrutiny because P&G failed to

explain why it had found Mr. Maciejczak only partially disabled in 2001, but totally disabled in

1995, particularly as medical evidence appeared to indicate that his condition had worsened

since 1995.  Id. at 21-23.

On January 21, 2005, this Court approved the parties' agreement that the Court decide

the merits of the case based on the record before the Court on P&G's summary judgment

motion, supplemented with three additional filings further detailing the structure and funding of

P&G's LTDA Plan.[1]  (Dkt. Entry 47.)  The parties have filed pretrial memoranda and

supplemental briefs, and this matter is now ripe for resolution.

## II.  BACKGROUND

Plaintiff was employed as a maintenance technician by Defendant Procter & Gamble

Company when he sustained a disabling back injury on November 19, 1994.  (Defs.' Statement

of Material Facts ("SMF") (Dkt. Entry 23) ¶ 5.)  At the time of his injury, Plaintiff was a

participant in an ERISA-covered disability plan sponsored by P&G.  (Id. ¶ 1.)

### A.  P&G's Disability Plan

P&G's disability plan includes a temporary benefits plan, the P&G Disability Benefit Plan

---

[1] The record was supplemented by two Depositions of Curt Hoffman, Chairman of the
Board of Trustees for the LTDA Plan, and the Declaration of J. F. Kramer, an Administrator of
the LTDA Plan.

(sometimes referred to as the Basic Disability Plan), and a long-term benefits plan, the LTDA

Plan.  Plan participants initially receive benefits for the first fifty-two (52) weeks of disability

under the Basic Disability Plan.  (See The P&G Disability Benefit Plan ("Plan Document") (Dkt.

Entry 26, Ex. A) at 17.)  After fifty-two (52) weeks of disability, benefits are governed by the

LTDA Plan.  (See id.; Letter from Defs.' Atty. (Dkt. Entry 26).)  P&G summarizes the LTDA plan

as follows:

> Apart from the [P&G Disability Benefit] Plan, the Company will
> provide continuing disability payments to a Participant in the Plan
> who has been totally disabled for more than 52 weeks, and who
> has received benefits from the Plan.  They shall receive payments
> at the rate of 50 percent of the recipient's Rate of Earnings at the
> time of disability. . . .   The terms and definitions of The Procter &
> Gamble Disability Benefit Plan will otherwise apply, as applicable.

(Plan Document at 17) (emphasis added.)

"Total disability" is defined as "a mental or physical condition resulting from illness or

injury which is generally considered totally disabling by the medical profession.  Usually, total

disability involves a condition of such severity as to require care in a hospital or restriction to the

immediate confines of the home."[2]  (Id. art. II, § 16.)  The plan defines "partial disability" as "a

mental or physical condition resulting from an illness or injury because of which the Participant

---

[2] This definition, as well as other definitions and terms set forth in this opinion, are set
forth in the P&G (Basic) Disability Benefit Plan.  The LTDA Plan adopts the terms and
definitions of the P&G (Basic) Disability Benefit Plan.  Id. at 17.

4

cannot perform regular duties but can perform other useful duties."  (Id. art. II, § 11.)

Significantly, the LTDA plan affords benefits only for total disability.

The LTDA Plan is administered by two company-appointed Trustees.  They are vested

with discretionary authority to interpret the plan and to make disability benefit determinations.

(Id. art. VII, § 1(h).)  The Trustees are volunteers who work in other jobs with P&G and receive

no additional pay for their Trustee-related duties.  (Id. art. VII, § 1(f); see also Tr. of Hoffman's

Dec. 7, 2004 Dep. for the Carpenter Case presented as part of the Appendix in this case

("Hoffman Dep. I") (Dkt. Entry 50) at 14-15.)

The Trustees may establish a three-person review board to conduct an initial

investigation and recommendation concerning a participant's eligibility for benefits.  (Plan

Document, art. VIII, §§ 2-4.)  Members of the review board work in other positions at P&G and

receive no additional pay for their review board-related activities.  (Hoffman Dep. I at 28.)  P&G

also pays case managers from an outside company, Gates McDonald, to provide medical

reviews for the Trustees.  (Id. at 23-24.)

P&G may require participants receiving benefits under the plan to undergo an

examination by a doctor of its choice.  (Id. art. VI, § 6(d).)  If the examination shows that the

participant is no longer totally disabled, benefits may be discontinued.  (Id.)

Benefits under the LTDA Plan are paid from a trust account funded by P&G.  (Hoffman

Dep. I at 16-17.)  P&G utilizes an actuarial firm to estimate the LTDA Plan's unrevealed costs

and future liabilities.  (Id. at 35-36.)  Based on these estimates, P&G determines how much

money to contribute to the trust fund.  (Id. at 16-17.)  If the trust account lacks sufficient funds

to pay benefits, P&G must make up the deficiency.  (Id. at 16.)

Under the Basic Disability and LTDA plans, "[a] participant who may be eligible to

receive Social Security, State disability or other legislated or governmental benefits must apply

for such benefits and inform the Trustees as to the result of such application in order to be

eligible for benefits."  (Plan Document art. VI, § 4; id. at 17.)  Disability payments under both

plans are reduced by the amount of social security disability benefits received.  (Plan Document

art. VI, § 4; id. at 17.)

## B.  Mr. Maciejczak's Disability Claim

After experiencing extreme back pain while working on November 19, 1994, Mr.

Maciejczak went to his family physician, Dr. Cheryle Stone, who diagnosed him as having

degenerative disc disease and three herniated discs.  (Administrative File ("AF") (Dkt. Entry 23-

1) at 451.)[3]  He subsequently began receiving total disability benefits under P&G's Basic

Disability Plan.  (Id. at 371.)  Mr. Maciejczak also saw other doctors who confirmed Dr. Stone's

diagnosis.  (Id. at 451-52.)

P&G encouraged Mr. Maciejczak to file for social security disability benefits in April of

---

[3] The Administrative File bears in sequential order Bates numbers P&G/MACIEJ 000371
through 000466.  The citation here will be limited to the last three digits.

6

1995.  (Id. at 371.)  The Social Security Administration initially denied benefits to Mr.

Maciejczak, finding him to be only partially disabled.  (Id.)

In September of 1995, P&G asked Mr. Maciejczak to submit to an independent medical

examination ("IME") by Michael D. Wolk, M.D. (Id. at 451-55.)  Dr. Wolk reviewed Mr.

Maciejczak's medical record, including magnetic resonance imaging ("MRI") and radiology

reports from 1994.[4]  (Id. at 453-54.)  In Dr. Wolk's opinion, Mr. Maciejczak had "significant"

degenerative disc disease with evidence of left-sided herniation of the L4-L5 disc and disc

protrusion of the L2-L3 and L4-L5 discs.[5]  (Id. at 454.)  Dr. Wolk nonetheless concluded that the

pain expressed by Mr. Maciejczak was "magnified beyond what [was] present objectively and

---

[4]  Dr. Wolk observed that the MRI report showed a left-sided L5-S1 disc herniation, a
right-sided L4-L5 disc herniation, a left-sided L2-L3 disc protrusion, and "diffuse degenerative
disc disease from L2 through S1."  (Id. at 453-54.)  The radiology report documented
"segmentation anomaly with four lumbar type vertebrae, scoliosis convexed to the left with a
Gibbons deformity from an ununited ossification center at the cranial end plate of L2."  (Id.)

[5] Specifically, Dr. Wolk reported:

> It is my opinion with a reasonable degree of medical certainty that
> this individual has significant degenerative disc disease with
> lumbar spondylosis of the lumbosacral spine with evidence of
> previous disc herniations at L5-S1 left sided with previous historical
> evidence of radiculopathy and there is disc protrusion at L2-L3 and
> L4-L5 with a congenital anomaly of the lumbar spine with some
> scoliosis.

(Id. at 454-55.)

clinically and there [was] no evidence . . . of persistent radiculopathy."[6]  (Id.)  He did not

recommend surgery for Mr. Maciejczak.  (Id. at 454-55.)  Dr. Wolk disagreed with another

doctor's conclusion that Mr. Maciejczak was totally disabled, stating that "it is my opinion with a

reasonable degree of medical certainty that he is capable of at least performing sedentary type

work as long as he is able to change positions."  (Id. at 455.)

Despite Dr. Wolk's opinion, the Trustees awarded Mr. Maciejczak total disability benefits

under the LTDA Plan after his fifty-two (52) weeks of eligibility under the Basic Disability Plan

ended on November 27, 1995.  (Defs.' SMF ¶ 5.)  In November of 1996, Mr. Maciejczak's

second appeal for social security benefits succeeded.  (AF at 371.)  In accordance with the

provisions of the LTDA plan, his disability payments were reduced by the social security

payments.  (Defs.' SMF ¶ 6.)

In November of 1999, P&G conducted a review of Mr. Maciejczak's continued eligibility

for LTDA benefits.  (Id. ¶ 8.)  Mr. Maciejczak's medical records were reviewed on behalf of the

Trustees by Dr. Elizabeth Genovese.  (Id. ¶ 8.)  Her review appears to have been limited to Dr.

Wolk's 1995 report, supplemented by unspecified "subsequent records."  (AF at 450.)  Dr.

Genovese concluded:

> Based upon the records currently available for review I do not see
> why Mr. Macieijaczak [sic] could not do sedentary to light work.
> The fact that he is on Percocet does not necessarily preclude

---

[6]  Radiculopathy is "a disease of the nerve roots."  DORLANDS'S ILLUSTRATED MEDICAL
DICTIONARY 1562 (30th ed. 2003).

8

> employment as I assume that he has become habituated to this
> drug at this time.  Nonetheless I do feel that we do need to
> evaluate what he can and cannot do.  A FCE [functional capacity
> evaluation] might be one way of achieving this since it would, in
> addition to assessing his physical capacities, allow us to see to
> what extent his medication deters his ability to function.
> Alternatively an IME with a physician either in physiatry or
> occupational medication might also be of use.

(Id. at 450.)

A functional capacity evaluation ("FCE") of Mr. Maciejczak took place on November 30,

1999.  (Defs.' SMF ¶ 9.)  The evaluator warned that the assessment was "an indeterminate

representation of John Maciejaczak's [sic] present physical capabilities" because of

inconsistencies in the test results.  (AF at 456.)  He also noted that Mr. Maciejczak did not fully

participate in the evaluation.  (Id.)  In the evaluator's conditional assessment, Mr. Maciejczak

could tolerate a two hour workday and withstand sedentary to light physical demands.  (Id.)

Upon reviewing the FCE report, Dr. Genovese advised:

> The FCE is a patient's opportunity to "prove" disability.  In the case
> of this patient, his behavior was such as to suggest that he is not at
> all as disabled as claimed.  I am therefore inclined to state that he
> most likely could go back to full time work on at least a sedentary
> basis, as I have previously described.  Given the FCE, however,
> you may well need to candidly observe his activities and then
> forward a record of this to the therapist for his review.

(Id. at 449.)

On November 10, 2000, Mr. Maciejczak appeared at Dr. Wolk's office to participate in

another IME requested by P&G.  (Defs.' SMF ¶ 10.)  Dr. Wolk noted that Mr. Maciejczak

"displayed significant overreaction" and put forth a "conscious effort to magnify his symptoms." (AF at 438.)  Indeed, Dr. Wolk was unable to complete the IME because Mr. Maciejczak refused to submit to a full examination.  (Id.)

The examination was rescheduled for February 9, 2001.  (Defs.' SMF ¶ 12.)  Dr. Wolk reviewed Mr. Maciejczak's medical records, including records submitted by his doctors, and incorporated his 1995 IME into his evaluation.  (Id. at 440, 442.)  Dr. Wolk again diagnosed Mr. Maciejczak as having degenerative disc disease with previous left-sided herniation of the L4-L5 disc and history of radiculopathy,[7] but found that "his subjective complaints are far out of proportion to any true objective findings."  (Id. at 444.)

Dr. Wolk also completed a physical capacities evaluation in which he determined that Mr. Maciejczak was able to sit, stand, and walk eight hours a day, and that he could lift up to 10 pounds.  (Id. at 446.)  He further estimated that Mr. Maciejczak could use his arms and hands for simple grasping, fine manipulation, keyboarding, and reaching over his shoulders from 67%

---

[7] Dr. Wolk's full diagnosis was as follows:

> It is my opinion, with a reasonable degree of medical certainty, that this individual has[,] as noted on previous examinations, degenerative disc disease with lumbar spondylosis involving multiple levels of the lumbosacral spine, with a previous left-sided disc herniation at L5-S1 and some scoliosis of the lumbar spine. He also has congenital anomaly of the spine, with previous history of radiculopathy on the left.

Id. at 444.

to 100% of an eight hour workday.  (Id. 446-47.)  Mr. Maciejczak also could push/pull, operate

foot controls, climb, kneel, and squat from 34% to 66% of an eight hour workday.  (Id.)  Based

on this evaluation and his medical review, Dr. Wolk concluded that Mr. Maciejczak "is capable

of performing at least sedentary type of work, with the ability to change position as needed, with

bending restricted to an occasional basis. . . . [Mr. Maciejczak's physical capacities evaluation]

represents maximum medical improvement, and he does not require further diagnostic testing

or therapeutic intervention, other than maintenance."  (Id. at 446.)

On April 4, 2001, the Trustees of the LTDA Plan determined that Mr. Maciejczak was

only partially disabled and that he was not eligible for benefits under the LTDA Plan, retroactive

to the date of Dr. Wolk's evaluation.  (Id. at 433.)  Mr. Maciejczak was informed that he could

appeal the decision and submit additional information.

On June 5, 2001, Mr. Maciejczak appealed the Trustees' finding that he was partially

disabled.  (Id. at 424.)  In support of his appeal, he submitted a letter from Dr. Stone, stating her

conclusion that Mr. Maciejczak was totally disabled and unfit to return to work.  He also

submitted a radiology report and a MRI report for examinations conducted on May 22, 2001.

(Id. at 427-31.)

By letter dated July 16, 2001, Mr. Maciejczak was informed that his appeal had been

denied.  (Id. at 420-21.)  The letter sets forth the following explanation for denying the appeal:

The documents submitted merely reaffirmed Mr. Maciezjcak's [sic]

11

> degenerative disc disease with spondylosis.  His appeal did not
> contain any objective data to support the degree of limitations due
> to radiculopathy.  A chronic L5 radiculopathy was established and
> reported in the September 13, 1995, IME report.  No acute
> changes have been objectively identified at any time, and Mr.
> Maciezjcak [sic] was determined to be at his maximum medical
> improvement. . . . [D]espite Mr. Maciezjcak's [sic] subjective
> complaints, his appeal failed to demonstrate a degree of functional
> impairment that would constitute total disability.

(Id. at 420.)

The Trustees again relied on Dr. Wolk's 2001 IME to reach the conclusion that Mr.

Maciejczak was "able to perform some useful duties," and thus was not totally disabled as

defined by the plan.  (Id. at 420-21.)  It does not appear, however, that Dr. Wolk was asked to

review the 2001 MRI or radiology reports.  The letter also fails to take notice of the 2001 MRI

report. (See id.)  It is perhaps notable, then, that the 2001 MRI report suggests an exacerbation

of Mr. Maciejczak's degenerative disc disease, with (1) a moderate herniation of the T12-L1

thoracic disc, (2) a right-sided herniation of the L2-3 disc in addition to the previously reported

left-sided herniation, and (3) a small central herniation of the L3-4 disc.[8]  (Compare id. at 429-

30, with id. at 453-54.)

Other than Dr. Wolk's report, the letter did not set forth any information indicating that

Mr. Maciejczak's condition had improved since the time of the initial disability decision.  Nor did

---

[8]   It is unclear whether the previously identified protrusions and herniations of the L2-3,
L4-5, and L5-S1 discs had worsened in the 2001 MRI report.

the letter attempt to reconcile the earlier finding of total disability with the finding that the

disability was now only partial.  Mr. Maciejczak was informed of his right to appeal.  (Id. at 421.)

Mr. Maciejczak challenged the decision.  (Id. at 417.)  He supported his challenge with a

sworn question and answer session with Dr. Stone from September 6, 2001.  (Id. at 397-415.)

Dr. Stone stated that she had treated Mr. Maciejczak for the previous six years for "chronic

back pain syndrome secondary to multiple herniated discs in his back."  (Id. at 400.)  The

doctor further stated that she found Mr. Maciejczak to be credible.  (Id. at 409.)  She also

related that she had regularly submitted FCEs to P&G indicating that Mr. Maciejczak was

"unable to perform any work."  (Id. at 396, 407-08.)  It was Dr. Stone's opinion that Mr.

Maciejczak was totally and permanently incapacitated.  (Id. at 412.)

On October 4, 2001, a certified case manager from Gates McDonald, Peggy Telford,

R.N., reviewed Mr. Maciejczak's case file supplemented with Dr. Stone's transcript.  (Defs.'

SMF ¶ 18.)  Telford concluded that the question and answer session and related

documentation did not "provide any evidence of disabling symptoms or changes in condition."

(AF at 388.)  Relying on Dr. Wolk's reports, she concluded that there was "insufficient medical

[evidence] to support total disability."  (Id.)

By letter dated October 15, 2001, Mr. Maciejczak's counsel submitted a report from a

chiropractor who had treated Mr. Maciejczak from August 10, 2001 to October 12, 2001 "to

ascertain whether chiropractic care might improve [his] condition."  (Id. at 382.)  In his report,

the chiropractor stated:

> Mr. Maciejczak was seen three times a week for two weeks, twice
> a week for one week, and every other week until October 12, 2001.
> Through this course of therapy the best that we accomplished was
> temporary relief of some of his symptoms.
>
> As per his latest MRI dated May 12, 2001, Mr. Maciejczak has
> multiple herniations, cord compression, nerve root compression
> and degenerative changes throughout the lumbar spine.  According
> to AMA guidelines, Oswestry, and Visual Analog scale pain
> drawing, it is my professional opinion that Mr. Maciejczak is totally
> disabled.  Due to the degenerative nature of the spine and
> comparison to other MRI studies, it can be ascertained that Mr.
> Maciejczak's condition is degenerating and unstable.

(Id. at 382)

In November of 2001, Telford again reviewed Mr. Maciejczak's entire file, now

supplemented with the chiropractor's report.  (Id. at 380.)  Once again, Telford relied on Dr.

Wolk's determination that Mr. Maciejczak could perform "at least sedentary type of work" to

conclude that he was not totally disabled.  (Id.)

By letter dated January 3, 2002, the Trustees informed Mr. Maciejczak that their

decision remained unchanged.  (Id. at 373.)  The Trustees reiterated their conclusion that "[t]he

documents submitted merely reaffirmed the diagnosis and symptoms."  (Id. at 374.)  They also

reiterated their reliance on Dr. Wolk's report, including his assessment of Mr. Maciejczak's

ability to work.

As a consequence, Mr. Maciejczak received partial disability benefits from February 9,

14

2001 until February 7, 2002.  (Id. at 376.)  It appears that payments under the P&G employee

benefit plans terminated at that time.

## III.  STANDARD OF REVIEW

        Mr. Maciejczak initiated this action against P&G to recover long-term disability benefits

under 29 U.S.C. § 1132(a)(1)(B).[9]  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

(1989), the Supreme Court held that a "denial of benefits challenged under § 1132(a)(1)(B) is to

be reviewed under a de novo standard unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

the plan."  When the language of a plan governed by ERISA accords the administrator

discretionary authority to determine eligibility for benefits, judicial review of a decision to deny

benefits is limited to ascertaining whether the denial is arbitrary and capricious.[10]  See Vitale v.

Latrobe Area Hosp., 420 F.3d 278, 281-82 (3d Cir. 2005); Abnathya v. Hoffmann-La Roche,

Inc., 2 F.3d 40, 44-45 (3d Cir. 1993).   Under this standard, an administrator's decision "will be

overturned only if it is clearly not supported by the evidence in the record or the administrator

has failed to comply with the procedures required by the plan."  Vitale, 420 F.3d at 282 (quoting

---

        [9] Section 1132(a)(1)(B) authorizes a benefit plan participant to bring a civil action "to
recover benefits due to him under the terms of his plan, to enforce his rights under the terms of
the plan, or to clarify his rights to future benefits under the terms of the plan."

        [10] "The 'arbitrary and capricious standard' is essentially the same as the 'abuse of
discretion' standard."   Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993).

Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000)).

Where, however, an administrator with discretionary authority to decide eligibility for benefits is burdened by a conflict of interest, "that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" Firestone Tire & Rubber Co., 489 U.S. at 115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 187, cmt. d (1959)).  In Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), our Court of Appeals interpreted Firestone Tire to require heightened review of "discretionary decisions in situations where the impartiality of the administrator is called into question, either because the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." Goldstein v. Johnson & Johnson, 251 F.3d 433, 435-36 (3d Cir. 2001).  This "heightened form or review is to be formulated on a sliding scale basis" reflecting the degree of conflict.  Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004).

In this case, there is no dispute that benefits determinations are committed to the discretion of the Plan's Trustees.  Thus, de novo review is inappropriate.  The question here is whether the impartiality of the administrators of the LTDA Plan is called into question to warrant a more intense level of review than the deferential arbitrary and capricious standard.

Our Court of Appeals has made a distinction between employer-funded plans that are

16

actuarially grounded and plans that are funded on a case-by-case basis.  See Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 174 (3d Cir. 2001).  An actuarially grounded plan, "with the company making fixed contributions to the pension fund, and a provision requiring that the money paid into the fund may be used only for maintaining the fund and paying out pensions," generally does not trigger the sort of conflict of interest requiring a heightened form of review.  Pinto, 214 F.3d at 388; see also Vitale, 420 F.3d at 282.  This is because "the employer in such a circumstance 'incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits.'"  Pinto, 214 F.3d 388 (quoting Abnathya, 2 F.3d at 45 n.5, and Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 n.4 (3d Cir. 1997)).  In contrast, an employer-fiduciary may be subject to a conflict of interest when administering a plan funded on a case-by-case basis, because benefits are paid "out of operating funds rather than from a separate ERISA trust fund."  Vitale, 420 F.3d at 282.

     In its July 7, 2004 Memorandum and Order denying P&G's motion for summary judgment, this Court previously determined that heightened scrutiny was appropriate primarily because it appeared that P&G funded the LTDA Plan on a case-by-case basis.  Maciejczak v. Proctor & Gamble Co., No. CV-02-1041, slip op. at 16-17 (M.D. Pa. July 7, 2004) (Dkt. Entry 32).  Afterwards, P&G was granted leave to submit additional evidence detailing the structure and funding of the LTDA Plan.  (Dkt. Entry 47.)  P&G argues that consideration of this additional evidence compels the conclusion that heightened scrutiny is not warranted.

P&G supplemented the record with the deposition of the Chairman of the Board of

Trustees for the LTDA Plan, Curt Hoffman, detailing the structure of the LTDA Plan.  According

to Mr. Hoffman, benefits under the LTDA plan are paid out of a trust fund.  P&G makes

contributions to the trust fund based upon estimates of the current year's claim liability, the

estimated future long-term disability benefits, and the investment return of the fund.[11]  An

actuarial determination of unrevealed claims and future liabilities is used to estimate future

long-term benefits.  P&G guarantees the liquidity of the trust fund and there is no evidence that

P&G may take money out of the fund.

Based on this evidence, it does not appear that the LTDA Plan is funded on a case-by-

case basis so as to warrant heightened scrutiny.  Nor does it appear, though, that P&G makes

fixed actuarially grounded contributions to the fund.  Instead, P&G merely considers the

actuarially based estimates of plan costs in determining contributions.  P&G could reduce its

contributions to the fund if actual disability payments under the Plan are reduced.  Thus, a

potential conflict of interest exists for the P&G-appointed Trustees to reduce the actual disability

_____

[11]  The LTDA plan had assets of $26,316,060 as of June 30, 2001, and $19,807,817 as of June 30, 2002.  (See Ex. 2, Hoffman Dep. I.)  The payments for plan participants for the year ending June 30, 2001 was $6,588,753 and for the year ending June 30, 2002 was $7,888,492. (Id.)  The current and estimated future liabilities of the fund as of June 30, 2001 totaled $37,661,238 (of which $521,998 was classified as currently payable) and as of June 30, 2002 was $42,133,029 (of which $606,357 was classified as currently payable).  (Id.)  The fund's total investment income for the year ending June 30, 2001 was $2,927,425 and the year ending June 30, 2002 was $1,730,072.  (Id.)  P&G made no contributions to the fund in 2001 or 2002. (Id.)

payments under the plan by applying a stricter standard to disability claims.  Therefore, a highly

deferential standard does not seem appropriate in this case.[12]  See Vitale, 420 F.3d at 282

(finding deference appropriate where "contributions to the fund are determined by an actuarial

formula and are not directly influenced by individual benefits decisions"); Pinto, 214 F.3d at 388

(noting that deference is appropriate when an employer makes "fixed" contributions determined

by an actuarial formula).

    A similar plan was considered in Grossman v. Wachovia Corp., No. Civ.A. 04-3701,

2005 WL 2396793 (E.D. Pa. Sept. 27, 2005), where benefit payments could potentially come

from the company's general assets and a company administrator ultimately made benefit

determinations.  The District Court held that a slightly heightened standard of review was

appropriate.  Id. at *8.  The Court's decision relied heavily on the fact that the defendant

company used an independent third party to initially review disability claims.  Id.  This

decreased concerns that the administrator's decision was based on a conflict of interest.  Id;

see also Pinto, 214 F.3d at 383 (stating that a conflict of interest typically does not exist when

---

[12] It should also be noted that P&G may also have lacked the typical check against self-interest of wanting to maintain employee satisfaction in this case.  See Pinto, 214 F.3d at 386 (noting that the inherent conflict that exists when a company both funds and administers a plan may be lessened when "the employer had incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits").  Mr. Maciejczak had not worked at P&G for more than five (5) years when his LTDA benefits were terminated.  Moreover, he was not offered a position to return to the company.  Thus, the termination of Mr. Maciejczak's LTDA benefits likely had little influence on overall employee satisfaction at P&G.

the employer funds a plan and pays "an independent third party to interpret the plan and make plan benefits determinations").

   P&G also uses independent third parties to review disability claims, though benefits determinations are ultimately made by the P&G-appointed Trustees.  As discussed above, a minor conflict of interest exists for the Trustees.  This is mitigated by the use of the independent third party evaluators, suggesting that a slightly heightened standard of review is appropriate.

   Other factors also counsel for the use of a slightly heightened version of the arbitrary and capricious standard of review.  Though the Trustees for the LTDA Plan are appointed by the P&G Board of Directors, this is offset by the fact that the Trustees are employees of P&G and also potential beneficiaries under the LTDA Plan.  Moreover, the Trustees are not paid for their work as Trustees (though it may help further their career).  These factors indicate that the Trustees have only a mild, if any, bias for P&G over the claimants.

   Our Court of Appeals has also suggested that concerns about a conflict of interest are diminished when the amount in controversy is relatively low compared to the assets of the plan. See Pinto, 214 F.3d at 386.  In the present case, Mr. Maciejczak's disability payments totaled $8,316 per year, which is relatively insignificant compared to the $26,316,060 in plan assets or the $6,588,753 in plan payments made in 2001, when it was decided to terminate Mr. Maciejczak's benefits.  Of course, a court must be wary of giving too much weight to this factor, as every claimant's disability payment is relatively insignificant compared to the aggregate.

20

Nonetheless, it does decrease concerns that the Trustees' decision was based on a conflict of interest.

Consideration of all these factors leads to the conclusion that a slightly heightened arbitrary and capricious standard of review is appropriate for the Trustees' decision to terminate Mr. Maciejczak's long-term disability benefits.  As noted by Our Court of Appeals, however, application of this standard can be difficult because "it is not clear how to employ a slightly heightened form of the arbitrary and capricious standard."  Stratton, 363 F.3d at 255.  A Court is advised to "apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of [the] review to the intensity of the conflict."  Id.

## IV.  ANALYSIS

Mr. Maciejczak's benefits under the LTDA Plan were terminated after the Trustees determined that he was not totally disabled as defined by the plan.  The Trustees primarily relied on the opinion of an independent medical examiner, Dr. Wolk, to reach their decision.

Mr. Maciejczak presents three arguments for why this Court should overturn the Trustees' decision: (1) the Trustees failed to give adequate consideration to his treating health care providers' opinions that he was totally disabled; (2) the Trustees failed to present evidence of an improvement in Mr. Maciejczak's condition after initially finding him totally disabled in 1995; and (3) the Trustees failed to consider a 2001 MRI report indicating that his condition had

worsened since 1995.

Mr. Maciejczak's primary argument is that the Trustees failed to explain why they rejected the opinions of his treating physician and chiropractor.  In the end, this case essentially boils down to a difference of opinion among medical experts regarding the degree of Mr. Maciejczak's disability.[13]  The Trustees ultimately decided to follow Dr. Wolk's medical opinion that Mr. Maciejczak was not totally disabled.  The question before this Court is whether the Trustees' decision was arbitrary and capricious, considering any conflicts of interest involved in the decision.

Our Court of Appeals confronted an analogous situation in Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250 (3d Cir. 2004), where administrators of a health plan refused to repay the medical expenses incurred for a surgical procedure recommended by the plan participant's treating physician, but not by the plan's doctors.  Id. at 252-53.  The Court denied the plan participant's appeal, noting that "'[a] professional disagreement does not amount to an arbitrary refusal to credit" the plan participant's doctor.  Id. at 258.  The Court cited to Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), which addressed a plan administrator's obligations when confronted with conflicting medical evidence:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require

[13] There is no dispute among the parties that Mr. Maciejczak suffers from degenerative disc disease with evidence of herniated discs and a history of radiculopathy.

22

> administrators automatically to accord special weight to the
> opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit
> reliable evidence that conflicts with a treating physician's
> evaluation.

Id. at 834.

The Trustees met their obligation in this case.  It is evident from the record that the

Trustees considered all the evidence submitted by Mr. Maciejczak.[14]  The Trustees, however,

were ultimately persuaded by Dr. Wolk's evaluation over the assessments of Mr. Maciejczak's

medical experts.

In their letters denying Mr. Maciejczak's appeals, the Trustees explained why they were

not persuaded by Mr. Maciejczak's medical experts.  In the Trustees' assessment, most of the

evidence submitted by Mr. Maciejczak's medical experts merely reaffirmed his diagnosis, but

failed to indicate the degree to which his condition impaired his ability to work.  (See AF at 373-

74, 420-21.)  For instance, the 2001 MRI and radiology reports submitted by Dr. Stone

indicated bulging of his lumbar discs consistent with degenerative disc disease, but failed to

indicate how these bulges limited Mr. Maciejczak's ability to perform useful duties, such as

grasping objects with his hands or using a keyboard.

----

[14]  In a letter dated July 16, 2001, the Trustees failed to take notice of a 2001 MRI report
submitted by Mr. Maciejczak.  (AF at 420.)  This MRI report, however, was considered in an
October 4, 2001 review of Mr. Maciejczak's file, indicating that P&G did indeed consider the
MRI report.  (Id. at 388.)  The Trustees explicitly made note of all other medical evidence
submitted by Mr. Maciejczak.

The Trustees were also skeptical of the evidence submitted by Mr. Maciejczak's experts relevant to his ability to perform useful duties.  Mr. Maciejczak's treating physician, Dr. Stone, submitted functional capacity evaluations ("FCE") typically used to indicate a person's ability to perform specific physical activities, such as standing or grasping.  Dr. Stone concluded that Mr. Maciejczak "was unable to perform any work" in the FCEs.  The veracity of the evaluations were undermined, however, by the manner in which Dr. Stone completed them.  Instead of completing individual assessments of Mr. Maciejczak's ability to perform specific tasks, such as sitting, standing, walking, grasping, or using a keyboard, Dr. Stone simply placed a line through all the activities, presumably indicating that Mr. Maciejczak could not perform any of the activities.  (See AF (Dkt. Entry 23-2) at 396.)  It appears from the record, however, that Mr. Maciejczak could at least occasionally perform some of activities listed on the evaluation, such as standing.[15]  Dr. Stone's ultimate conclusion that Mr. Maciejczak was unable to perform any work is undermined by her failure to make and report a full assessment of his capabilities.

In addition, the opinions of Mr. Maciejczak's medical experts were often based on Mr. Maciejczak's own subjective complaints, which the Trustees did not find credible.  The Trustees based their skepticism of Mr. Maciejczak's subjective complaints on Dr. Wolk's observation that Mr. Maciejczak magnified his complaints "far out of proportion" to actual medical results, as well

---

[15] In Dr. Stone's own deposition, she stated that Mr. Maciejczak "usually stands throughout the exam because he says he just can't sit any longer."  (AF at 412.)  This suggests that Mr. Maciejczak can at least stand occasionally.

as Dr. Genovese's suggestion that Mr. Maciejczak was exaggerating his injury.

In contrast, the Trustees found that Dr. Wolk's opinion was supported by evidence indicating that Mr. Maciejczak could perform some useful duties.  In 1999, a certified assessment specialist performed a FCE, and concluded that Mr. Maciejczak could handle sedentary to light physical demands based on his ability to sit for two (2) hours and use his hands for tasks such as grasping.[16]  In 2001, Dr. Wolk completed a physical capacities assessment in which he determined that Mr. Maciejczak could perform at least some useful duties, such as using his hands and arms for grasping, fine manipulation, and keyboarding.  He also concluded that Mr. Maciejczak could walk, stand, and sit for eight (8) hours a day.  These observations led the doctor to conclude that Mr. Maciejczak was not totally disabled, as he was capable of performing at least sedentary work.

This Court does not find the Trustees' decision to accept Dr. Wolk's opinion over Mr. Maciejczak's medical experts arbitrary or capricious, even under slightly heightened scrutiny. The medical evidence in this case is sharply conflicted, and deference to the Trustees' determination in the face of that conflict must be respected.  See Leahy v. Ratheon Co., 315 F.3d 11, 18-19 (1st Cir. 2002).  The fact that Dr. Wolk's opinion was reaffirmed by other outside medical experts decreases concerns that the Trustees' decision was arbitrary.  See Grossman

---

[16]  It should be noted that, although the evaluator cautioned that his results were indeterminate, he suggested that Mr. Maciejczak's failure to participate in the evaluation was the reason the results were not definitive.

v. Wachovia Corp., No. Civ.A. 04-3701, 2005 WL 2396793, at *8 (E.D. Pa. Sept. 27, 2005).

Nor can this Court find that the Trustees' decision was "clearly not supported by the evidence in

the record."  See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 282 (3d Cir. 2005).

Mr. Maciejaczak's second argument is that the Trustees' decision to find him totally

disabled should be overturned because the Trustees failed to present evidence of an

improvement in his condition subsequent to finding him totally disabled in 1995.  Mr. Maciejczak

cites no precedent for his argument.  The Fifth Circuit addressed this issue in Ellis v. Liberty

Life Assurance Company of Boston, 394 F.3d. 262 (5th Cir. 2004), and held:

> [W]hen a plan fiduciary initially determines that a covered
> employee is eligible for benefits and later determines that the
> employee is not, or has ceased to be, eligible for those benefits by
> virtue of additional medical information received, the plan fiduciary
> is not required to obtain proof that a substantial change in the
> [long-term disability] recipient's medical condition occurred after the
> initial determination of eligibility. . . .  A contrary holding would
> basically prohibit a plan fiduciary from ever terminating benefits if it
> later discovered evidence that the ERISA plaintiff was not disabled
> at the time of the initial grant of benefits.

Id. at 274 (emphasis in original).  I find the Court's reasoning persuasive.

In this case, the Trustees initially determined that Mr. Maciejczak was totally disabled

despite Dr. Wolk's assessment that he could perform sedentary work and was therefore only

partially disabled.  In 1999, the Trustees revisited the issue of Mr. Maciejczak's eligibility under

the plan.  A functional capacities evaluation was conducted to determine the degree of Mr.

Maciejczak's disability.  An independent medical doctor, Dr. Genovese, determined that Mr.

26

Maciejczak was not totally disabled based on the evaluation and a review of his records.

Afterwards, Dr. Wolk performed a second medical evaluation of Mr. Maciejczak and also

assessed his ability to perform physical tasks.  Dr. Wolk again concluded that Mr. Maciejczak

could perform sedentary work and was not totally disabled.

The Trustees may consider this new evidence – as well as contrary evidence presented

by Mr. Maciejczak – to assess whether Mr. Maciejczak should receive benefits under the long-

term disability benefits.  Indeed, the disability plan empowers the Trustees to require plan

participant's receiving benefits under the plan to submit to subsequent examinations to

reassess eligibility under the plan.  (See Plan Document, art. VI, § 6(d).)  Though the Trustees

did not present evidence that Mr. Maciejczak's condition improved, they did present new

evidence that he was capable of performing some useful duties and, therefore, was not totally

disabled.  The Trustees' decision to rely on this new evidence to determine that Mr. Maciejczak

was no longer eligible for benefits is not arbitrary or capricious.

Mr. Maciejczak's final argument is that the Trustees failed to consider a 2001 MRI report

indicating that his condition had worsened since the time when the Trustees originally found

him totally disabled in 1995.  It is not accurate to assert that the Trustees failed to consider the

2001 MRI report.  It is true that the Trustees failed to mention the MRI report in a letter dated

July 16, 2001, while referencing a 2001 Radiology report submitted with the MRI report.  (AF at

420.)  The MRI report, though, is recorded in an October 4, 2001 review of Mr. Maciejczak's

file, indicating that the Trustees did indeed consider the MRI report.  (Id. at 388.)  It is clear, however, that Dr. Wolk never reviewed the 2001 MRI report.

Mr. Maciejczak nonetheless fails to show that consideration of the 2001 MRI report would alter the Trustees' or Dr. Wolk's decisions.  The MRI report was relevant primarily for indicating that Mr. Maciejczak suffered from degenerative disc disease.  Dr. Wolk and the Trustees already concluded that Mr. Maciejczak suffered from this disease.  The significant question for Dr. Wolk and the Trustees, however, was what effect the disease had on Mr. Maciejczak's ability to work.  The 2001 MRI report is only minimally relevant to this question. Tests concerning Mr. Maciejczak's ability to perform physical activities, like the one performed by Dr. Wolk, provided better evidence of Mr. Maciejczak's ability to work.  Thus, it cannot be said that the Trustees' decision to deny Mr. Maciejczak's benefits without requiring Dr. Wolk to review the 2001 MRI report was arbitrary or capricious.

## IV.  CONCLUSION

For the reasons stated above, the Trustees' decision to terminate Mr. Maciejczak's long-term disability benefits must be sustained.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

28

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN W. MACIEJCZAK** | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-02-1041** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **THE PROCTER & GAMBLE COMPANY,** | : | |
| **PROCTER & GAMBLE DISABILITY** | : | |
| **BENEFIT PLANS TRUST, THE PROCTER** | : | |
| **& GAMBLE DISABILITY BENEFIT PLAN** | : | |
| **CORPORATE REVIEWING BOARD, and** | : | |
| **THE PROCTER & GAMBLE PAPER** | : | |
| **PRODUCTS COMPANY** | : | |
| **Defendants** | : | |

## ORDER

**NOW, THIS 31st DAY OF MARCH, 2006**, in accordance with the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT**:

    1. The Clerk of Court is directed to enter judgment in favor of the Defendants.

    2. The Clerk of Court is directed to mark this matter **CLOSED**.


                                    **s/ Thomas I. Vanaskie**
                                      Thomas I. Vanaskie, Chief Judge
                                      Middle District of Pennsylvania